Good morning. Judge Roth, you can hear us? Yes, I hear you fine. Terrific. Well, we welcome Judge Roth obviously on video. Our first case for the day is number 16-2202 in Re Opus East. May it please the court. Good morning, Your Honors. Steve Sanfilippo for Appellant Jeffrey Birch, a bankruptcy trustee for the estate of Opus East LLC. I would like to reserve three minutes of my time for rebuttal this morning. That will be granted. The appellant has raised two issues in this court. I'd like to focus primarily, unless directed otherwise, to the court's balance sheet insolvency conclusion, and particularly... I do want to hear about the second one, though. I have a concern on that.  Yes, okay. I'll move quickly, Your Honors. With respect to the balance sheet insolvency finding, the parties agreed on the liability, so it really turned on the asset valuation. The court concluded that Opus East wasn't balance sheet insolvent until February 1, 2009, and we would submit there are three issues with that conclusion. The first being it's not based upon a balance sheet analysis or an analysis of the value of the assets. Wasn't this really a battle of the experts? It was sort of a battle of the experts, but there was only one expert that actually conducted a value analysis, and that was the appellant's expert. The defendant's expert submitted. He looked at their balance sheets and said, well, you know, as of March 31, 2008, they were still balance sheet insolvent. His opinion ended at March 31, 2008. He criticized our expert's opinion of June 30, 2008, but didn't offer another opinion, and the court went out to February 1, 2009, and there was no asset valuation that would support that. And under this court's opinion in In Re Trans World, which everybody agrees the court was bound by, the court was required to determine the valuation based upon a hypothetical sale of assets between a seller and a willing buyer during a reasonable time period, taking into consideration a realistic framework, and that analysis was not done, and we would submit that's error, which leads into the second error, which is not accepting our expert's opinion. The expert's opinion was rejected summarily because of the thought that he applied a liquidation value. It's clear from the record he applied a going concern valuation, but he applied a liquidation discount to certain real estate to account for the circumstances facing Opus East at the time. Can I ask you a more general question? Sure. I mean, in recent case law, Moody is one that says a firm will almost never be found to be insolvent because of inadequate capital if it continues, actually, as a going concern. And here Opus East survived for nearly three years beyond the date that you suggested for insolvency, 2006. How do you respond to that? That may be applicable to the inadequate capital test, but there are three separate insolvency tests, and that's not applicable to the balance sheet test. The balance sheet test only is what are your liabilities, what is the fair value of your assets, and which number is bigger. And we would submit that only one person did that analysis. That analysis wasn't done after June 30, 2008. And the court discounted the fact that he applied a liquidation discount to certain real estate assets. It wasn't to all of them. It was just to the directly owned real estate. But he did so based upon Opus East documents and the condition they were in, and particularly I would point the court to PX 113, where Opus East in March 2008 was telling its board that we have to sell what we have as soon as we can for what we can get. If that's not screaming application of a quick sale slash liquidation type discount, I don't know what is. And, you know, did they put up folks to look at his numbers and say, no, we don't think that's right? They did, but his numbers are based. You know, this isn't a case where we have our documents, they have their documents, and our guy opines, well, one way and they opine the other. Our guy used their documents. The story is laid out. The story of their insolvency is laid out from their documents. And you can't look at those documents and come to the conclusion that they were just sailing along fine until September 2008 when the Lehman Brothers crashed. So with respect to this issue, what's the appropriate standard of review? It is a clearly erroneous standard, but as this court has held, even if there's evidence to support it, if on balance and review of the record this court is left with the clear thought that a mistake has been made, that can be a clearly erroneous standard. And is it a high burden? Absolutely. We would submit that this is the one in a million cases that it actually should be found in, and we would just encourage the court. The problem we have is it's very document-intensive, but you can't get into the documents, which are all overseas documents, and come to a conclusion that this entity was solvent until February 1, 2009. It absolutely wasn't under any of the tests, and particularly the balancing tests. And with that, I will move on to the issue you would like to discuss, Your Honor. In particular, I'm interested in the duty of loyalty. I thought it was a little interesting. I was trying to find it in your briefing. You can correct me if I'm wrong. The district court agreed. There was sort of, I guess, what was called the process. In the LLC agreement, there was a process that needed to be followed. The big issue is whether or not they disclaimed that common law duty of loyalty in all of the common law duties. The district court found that we had to prove bad faith in order to find that any of the defendants breached their fiduciary duties. We would submit, I believe it's under the Geltman case, that the LLC agreement laid out a process that a fiduciary officer had to follow in order to resolve conflicts.  However, would the common law standards be replaced by what is effectively a bad faith standard? You say he didn't follow. I think if you look at the, and this is, again, clearly erroneous standard. If you were going to look at this and say, well, he stood up, he took the stand, he said he followed the procedures. Right. But notably, the district court agreed with you, right? The district court agreed that he didn't follow the agreement. But at the end of the day, we can get there. That's okay. Yeah, yeah, yeah. It's funny, you didn't cite that in your brief, though. The district court agreed with you on that. Well, in all honesty, we're focused so much on the insolvency stuff, and we figured given the clearly erroneous standard, if you look at the balance sheet stuff and thought that that doesn't get there, we thought it would be hard because of how document-intensive everything was. But we would submit as well that as Geldman holds, you can't look at that operating agreement and say that that disclaims automatically and you have to prove bad faith. You have to go through those steps. And, again, he took the stand, he testified, he went through the steps, and then you look at the evidence and you look at the documents, you say, no way. You can't, you know, far be it for us to say that the bankruptcy judge is not a reasonable fact finder. But respectfully, you can't look at that testimony and compare it to the documents and say that he followed the process he was required to follow. Of course, nonetheless, the district court said, but still no error because with respect to the duty of loyalty, under common law it wasn't proven. Maybe you could just deal with that a little bit. And, again, the same documents that prove that he didn't follow the process he was required to follow under the LLC agreement confirmed that he didn't do what he was supposed to do, the duty of loyalty, either. I mean, this was specifically with this GAMD transaction. The judge looked at it and said, well, this wasn't worth anything to Opus East. And then you look at the steps they went through to get this out of Opus East the day before bankruptcy and you look at it and say somebody must have thought it was worth something. And, in fact, there were several components that they had somebody interested in buying it and I think they thought they had a buyer. Now, the fact that they ultimately couldn't sell it and ultimately it became something that maybe wasn't as great as people thought at the time, I don't think that's the standard. I think you have to view it at the time that he's making his decisions on behalf of Opus East. And you look at the record and you can't say that that was in Opus East's best interest. Frankly, we thought that as a matter of law that met the bad faith standard when you look at the documents. And, again, the issue we're in is he took the stand, he said all the right things. But if you're going to compare testimony to documents, again, if there is ever a case where the credibility of the witnesses is taken out of the fact finder's hands, this is it. Now, page 42 of your friend's brief across the aisle says, The Bankruptcy Court determined that Mark Reinhorst, I hope I got the name pronounced correctly, properly considered the relative interest of each part of the transition, the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable or generally accepted accounting practices or principles. Do you agree with that? No. I agree that he said he did that. But I think if you look at the documents and see what the involvement was, he didn't do any of that. And he couldn't, you know, he had a miraculous memory when he was being directed by his lawyers. He couldn't remember a single thing about anything when he was being questioned by the trustee's lawyers. And, in fact, you know, again, somebody can't remember any of the details of any of the transactions, but remembers for a certainty he followed all of the steps he was required to follow to make sure that he didn't breach anything. Was there ever an independent valuation of ME, I guess, if we can call it, because that's whatever we call them in briefs, but ME's value? I don't know that there was any. There was an entity called Chatham that had valued it somewhere between $8 million and $16 million, I believe. And a good bit of that was there was a litigation going on. And that litigation was the GSA litigation. It was the GSA litigation, and that had a settlement offer somewhere in the range of like $7 million. So there was, you know, there was evidence that there was value to it at the time to Opus East. Again, the fact that that may have cratered after the fact and that value went away, I don't think that's the particular time frame you're looking at. You're looking at the time the decision was made, and the decision was made literally a day or two before bankruptcy. The transfer was taking place, and it was a transfer directly to the trust to get it out of Opus East before it went into bankruptcy. Is it fair to say that, I mean, would you agree Roundhorst was on both sides of the deal? Absolutely. Roundhorst was all over almost every one of the Opus entities. Let me go back to your statement where you said this is the one-in-a-million case. So should I interpret that to mean this is the one-in-a-million case where we should step into the shoes of the fact finder and reverse it? I'm not saying step in the shoes of the fact finder. I'm saying look at it and come to your own conclusions of whether in light of their documents and all of their documents a reasonable fact finder could come to the conclusion that the judge did. I hate to use the term step into the shoes because, of course, we all know you can't step into the shoes. At some level, that's what you do when you reverse, right? And we would say this is the case. Again, their documents tell a story that just is not – the bankruptcy court's opinion is not supported by any of the documents. So thank you, Your Honor. Okay. Thank you. We'll get you on rebuttal. Thank you. May it please the Court, Dennis Ryan, Fager, Baker, Daniels, on behalf of all of the appellees who were the defendants in this case. I do – I think our brief has adequately addressed most of the issues raised by the appellees. I do want to immediately address the point, though, that you asked about process. I respectfully would say I think you've misunderstood or misinterpreted the district court opinion. At page 12 of the district court opinion, what Judge Andrews says is the bankruptcy court did not explicitly consider whether Roundhorse, Burton, and Campa satisfied the process requirements of Section 12.32 of the Opus East LLC agreement for each challenge transaction. But he footnotes that, and he says, the bankruptcy court did specifically find that Roundhorse and Burton undertook the required analysis to resolve conflicts of interest for the transfer of M.E. to G.A.M.D. There's no question they found that, but on page 70, it's as conclusive as you can get. It was just – it basically said the standard and said he did it. But, no, I think she goes through the analysis, then the traditional analysis, which bolsters that finding because she – and not only do we have Mr. Roundhorse's testimony, and, yes, thank you, you pronounced his name correctly. Okay. We have his testimony, but we also have the testimony of Ms. Boland, who actually signed the documents, and she indicates that she had consulted with their bankruptcy counsel, Greenberg Traulig. She indicates that she and Marshall Burton spoke. Marshall Burton was the acting CEO at the time. Mr. Burton's testimony corroborates that he talked to Mr. Roundhorse about this, and the most important thing, I think, which the judge found is Mr. Roundhorse had been the chairman of the board of Opus East throughout all this time. He was familiar with the NOAA project from its inception, and she does a pretty good job of describing the torture history. I don't know. It sounds like he was vaguely familiar with the NOAA project. No, I think we're mixing up. What he was vaguely familiar with was the transaction to sell it to G.A.M.D. He was quite familiar with the project itself and its problems and the fact that he didn't believe it had any value to Opus East. Mr. Burton didn't believe it had any value to Opus East. Ms. Boland took her job very seriously as she testified in deciding to enter in the transaction, and as the judge found, getting $100,000 for what all of them considered to be a worthless asset at that point was in the interest of Opus East. It needed the cash going into the bankruptcy, and the facts bear it out. G.A.M.D. paid $100,000. They spent another $650,000 litigating with the GSA to no avail. In fact, the case was ultimately dismissed. They got $150,000 in option payments from Peterson Companies, who was interested if it was going to go well to acquire that Maryland Enterprise interest. That brings up something. I guess it was the bankruptcy court said he could find no other buyers, and yet you've got the Peterson Companies that at least signed up for an option. Right. But at the time before the bankruptcy, they hadn't even proposed an option agreement. They had a letter, which is in the record. You can find it actually in the appendix at page 1926. No, I'm sorry, that's where they talk about Peterson Companies, but there's an exhibit associated with that. Here's my point. It appears that Hound Horse was on both sides of the transaction. He testifies apparently that there's basically no other buyers, but we don't know what kind of efforts were made to find other buyers. You'd think that would be an important thing. Well, but there was. There was at least one that had some interest. And there were none, and Boland testified to that, and Burton testified to that, and Round Horse testified to that, and Round Horse was on the stand for the better part of three days. The plaintiff had the opportunity to cross-examine all of these people. The best the plaintiff could do was put in this exhibit of a letter prior to the bankruptcy where Peterson said we'd like to conduct some due diligence. That's all there was. Nobody was interested in actually buying the Maryland Enterprise interest at the time. This was the one opportunity that Opus East had to realize some cash. And, in fact, when the dust all settled, the buyer lost half a million dollars on the transaction. And I'd also frankly challenge, you know, we've sort of glossed over that Mr. Round Horse was on both sides of the transaction. First of all, I'd say it's a bit of a stretch that he's a beneficiary of one of the trusts that owned the company that then bought it. But even if that somehow motivated him, interestingly at trial and in the post-trial briefs. I don't think the creditors would agree with that. Well, but the interesting thing is at trial and in their post-trial briefing, and you'll find it in the bankruptcy court opinion, plaintiff argued that part of the failure of Mr. Round Horse was he didn't even know who the buyer was. So how could he believe that he was on both sides of the transaction if, as they're arguing, he didn't even know who GAMD was? So I think there's ample evidence in the record from what Judge Walrath observed of three witnesses who were directly and personally involved in the transaction, Boland, Burton, Round Horse. It's bolstered by the record, the exhibits and other things. I understand, you know, the standard is yes, if there's clear error, nothing in the record that reasonably supports the finding, you can reverse it. But the standard is also just because you would look at the record and look at the same testimony and you might come to a different conclusion, that's not sufficient. That's not clearly erroneous. And I think it's particularly important here where so much of this case turned on the live testimony of these witnesses, which Judge Walrath, you know, sat and, as the case law tells us, observed the demeanor, the tone of voice. She was the best judge of credibility. And we all know, reading the cold record now, two years later, we're just not in the position that she was to judge whether Mr. Round Horse or any of the other witnesses were being credible. What do you make of the deficiency of your experts, or, you know, the point that the appellate's counsel presented? See, I think this is where, this is an interesting issue because I think this is where the trustee's expert sort of missed the boat and where the bankruptcy court got it right. And as our expert said in a pint, he said that after reviewing the balance sheet, the audited balance sheet as of the end of March 2008, and the work papers from KPMG and the board books and the witness testimony, a lot of things, his opinion was that the balance sheet values were a fair approximation of fair value. So let's understand. Mims chose his problem in his supposed peer group comparison, which are REITs. REITs, of course, hold own property, and they earn their income from rents. A merchant builder, which Opus East is, is intrinsically different. Opus East was a manufacturer. What they manufactured was not goods but buildings. And if a REIT buys a building, they put it on their balance sheet at the purchase price, and then it slowly depreciates over time in accordance with GAAP. And, in fact, that's why we have the argument about is GAAP really fair value? Well, probably not because it requires a depreciation. The value could actually be more or less. In this case, it goes the other way. When a merchant builder like Opus East buys a piece of land for, say, $10 million, usually using equity, that's what goes on the books. And then as they invest money, they usually borrow. We'll use M Street. They put $10 million of equity in to acquire that property. They borrowed $60 million over time. They put that money in, and the building is built. And it's being actually increased on the balance sheet based on what they think they could sell that building for in a reasonable period of time. As they invest more and more in it, it becomes more valuable. And, obviously, once it becomes completed, usually the book value is just the combination of the money actually put in, the debt and the equity. And in the case of M Street, that approximated about $70 million. And then they signed a purchase agreement for $93 million. And there's their $23 million profit. So, in this case, the book value actually is a fair approximation of what the value of the asset would be if it were sold in a reasonable period of time. And that's the problem with Mim's analysis. He does his – he calls it as his adjustment. I think it's the fair value adjustment. And then his problem is he went from $75 million down, but he still had $15.6 million of equity. So then he said, well, you know, they're going to have to sell their properties in 30 days, even though they didn't have to. So I'm going to apply further adjustment to it, which Judge Walrath reasonably found. That's liquidation. You wouldn't try to sell your house in 30 days and expect to get a fair price for it. You certainly are not going to sell multimillion-dollar buildings in 30 days and contend that that's fair value. That's not liquidation. That's not a forced sale. That's just not reasonable. And the judge found – the problem throughout this is that the trustee, the judge made lots of findings. As you know, her opinion is heavily annotated with citations to the record. There's no question that there's support in the record for everything she did. She's very meticulous. It took nearly a year for her to write the opinion, and you can see the effort. And all the trustee does is essentially offer alternate facts. He would like you to believe something different than what actually happened. He hypothesizes they would have had to sell their assets in 30 days to pay down Bank of America in August. But they did pay down Bank of America in August, and they didn't sell any assets. And, in fact, at that time, they had M Street under contract for a $23 million profit, and they sold several other buildings in the third quarter, as the judge finds, at above liquidation value. So the problem is, you know, same as this cash flow inadequacy analysis starting in 2006. As Your Honor noted, the problem with that argument is they paid all their bills until they came due in February of 2009. So what we really have here is the judge is doing her job. She's looking for the date of insolvency, and she's finding that NIMS's analysis is flawed. He's not following what TransWorld says. And TransWorld, I would note, is that different situation. The assets that we're talking about there primarily were aircraft and gates. Those were not being held for sale. They were making money off it. TransWorld had no intention of selling its aircraft. It wants to keep its aircraft and earn money. So it's carrying, similarly, aircraft on the books at the acquisition cost with some depreciation. And then you have to figure they're not in the business of selling their aircraft. You know, what's a reasonable period of time? In fact, this court found, I think it was 9 to 16 months or something like that, you know, a fairly considerable period of time. So, you know, that was just a different situation. But what she found is he did not follow the TransWorld standard because he looked at it as a forced sale. And so she's looking where is the insolvency. The Bankruptcy Code, Section 547F, says a debtor is presumed insolvent for the 90 days prior to the bankruptcy filing. So Opus East is presumed insolvent April, May, June 2009. She could stop there. But she looked at the evidence. And what she found is the officers of Opus East in their testimony admitting, saying, gosh, at the end of January, we realized even though the buyer had given us $5 million non-refundable earnest money deposit, the credit environment was such that they just, they can't get the financing to close on a $93 million acquisition. They just can't do it. So we need to take that out of our calculations. We're going to run out of cash in the next few months without that $23 million. We need to start holding bills. That is, you know, the cash flow insolvency. They determined by February 1st, we are unable to pay our bills as they come due. We're going to start holding payments. And they did. And the evidence shows how the age payables went up very dramatically. What about Plaintiff's Exhibit 113, that we have to sell stuff for what we can get for it? Frankly, I'm glad you asked that. If you look in the – first of all, Mr. Roundhorse testified about that. And his testimony is in the appendix at pages 952 to 954. And Mr. Palachuk, the CFO of the holding company, concurred with what Mr. Roundhorse did. What he said is he meant you shouldn't be holding out for the highest price. Let's keep in mind that this is a business that sells buildings. But what he wanted people to feel was some urgency to not be lax about it, to not hold out for the highest price. Mr. Palachuk's concurring testimony is at pages 1435 to 1437 of the appendix. And I think the most important fact is right after that, in May 2008, Opus East signed the sales agreement for M Street with a $23 million profit in it and a $5 million non-refundable earnest money deposit. And as they reasonably felt, people walk away from $5 million. Even in this industry, $5 million is a significant amount of money for somebody to just throw away. They had every intention of closing that. And if it hadn't been, as the court found, that the insolvency was caused by the Lehman collapse and then the inability of the buyer to get financing and Opus East to realize that $23 million profit. So yes, there was more urgency. I think it shows the responsibility of the officers at the holding company and the lower level, recognizing the economy is starting to change. Yes, as Plaintiff points out, Bear Stearns ran into its trouble that spring. So they were not blind to the problem, and they were saying we need to be cautious, we need to liquidate what we can, but certainly not at fire sale prices. Okay, thank you, counsel. Quick points on insolvency. Lehman Brothers in September 2008 brought to light the problems with Opus East. They didn't cause them. The first major collapse was actually in March with Bear Stearns. That's volume 2384. As you can look, in January 2008, Opus Corp's chief financial officer told the board that Opus East was quote-unquote bankrupt. That's January 2008. By March 2008, they're already telling everybody to sell whatever the heck you can for whatever price you can get. This started long before Lehman Brothers. Second point, 113, Your Honor, you brought up Plaintiff's Exhibit 113, and you heard an explanation of what Mr. Roanhorse told the judge he really meant. Well, I think you can look at Exhibits 152 to see what Mr. Roanhorse really meant, because he subsequently sent a memorandum to the heads of the operating companies, which said our company is dangerously close to being insolvent, and I need each of you to do the following immediately. One, sell anything you can as soon as possible. I think that pretty well tells you what he meant in 113. Moving on, a couple quick points on the breach of fiduciary duty point. First, the court found that Roanhorse satisfied his fiduciary duties because he, quote-unquote, relied upon key members of the debtors' management team to keep him informed. In reality, the debtors' management team was shut out of the negotiations and didn't even know who the buyer was until a day after the deal was signed, and that's Plaintiff's Exhibits 231 and 313. In addition, the bankruptcy court relied on Marshall Burton, the quote-unquote highest-ranking officer of the debtor at the time, who consented to the sale. In Burton's own emails, he confirmed that he had no part in the transaction and that he had not read the documents or participated in the discussions. PX 231, PX 313. Did he take the stand? Did he say that he knew everything about it? Sure he did. The documents say what the documents say. Again, I come right back to, is this the case? You know, if this is ever a case, and we have a section in one of our briefs about credibility, counsel told you that the judge was in the best position. I would tell you, with so much thrown at that judge over the two-week period and so many documents and so many claims and moving parts, that you all are better in a position to actually step back from this morass and take a look. I have found over the years that Judge Walrath is very well qualified to deal with a number of documents thrown at her, and that she considers them very carefully, and she has never, to my knowledge, been overwhelmed by the amount that was thrown at her. I stand corrected, Your Honor. I was simply making the point that maybe that wasn't the reason, that it's just a bad explanation, I guess. But the fact remains, you all can look at the record and see for yourselves. Thank you. Thank you. Thank you, counsel. Thank you for the excellent briefing and oral argument today. We'll take the case under advisement, and if counsel have no objection, we'd like to greet you more informally at the sidebar, and thank you for your great efforts. Thank you, Judge.